Good afternoon. We're here for the embankment argument in Gonzalez v. City of Anaheim. And we have Judge Gould joining us once again by video. Judge Gould, good afternoon. Good afternoon. Thanks. You're coming through loudly clear? I think you're able to hear me. I can hear you and see you and the lawyer at the podium already. Okay. Well, Mr. Hoffman, you may proceed. May it please the Court, my name is Paul Hoffman. I'm appearing for the appellants. This Court has insisted in many cases on a searching inquiry when the use of deadly force by police officers leaves only the officers to tell the story about what happened. This Court has insisted that judges undertake that kind of analysis to see if there are internal inconsistencies. But in this case, there was more than just that. I mean, there was also physical evidence, right? Yes. The car had moved. Right. And the car had moved with Officer Wyatt in the non-driver's seat. That's correct. Okay. With the deceased, I'm sorry, the person with the wheel. Mr. Gonzales. I'm sorry? Mr. Gonzales. Mr. Gonzales. Mr. Gonzales had been at the steering wheel at the controls and the van was, what, 500 feet away from? None of that is in dispute. 50 feet away. I'm sorry, 50 feet away. Right. The dispute, well, there are a number of disputes. 50 feet away from what? Excuse me? 50 feet away from what? 50 feet away from where the car started is when the officer says that he shot Mr. Gonzales. And he said that the total time that it elapsed in that was 5 to 10 seconds. I thought he said 50 feet, but it was actually much more than that. In the record, as far as I can see, it's 50. I don't see that there's a farther point than that. I think he said 50 feet from when he shot him. You started at Santa Ana and Bond. That's where the car is. Excuse me? You started at Santa Ana and Bond going north, right? Santa Ana and Bond. Right. The next street is Willow. The next street is Elm. Both Wyeth and Ellis testified that the shot took place after the van had gone northbound on Bond's feet past Willow. That's a distance of about 270 feet from Santa Ana. Well, Your Honor, he testified that it was 50 feet. That's what he said. And he also testified he shot him after he passed Willow. Well, there's a discrepancy there, and it's not a minor point in the sense that he didn't say this just once. He said it not only in his deposition, and he never changed his deposition about how long it took him to shoot Mr. Gonzales. And seven days later, he put it in a declaration in support of a motion for summary judgment. Other than the number, which, you know, is obviously a point of contention, where was the squad car? Where was the police car? Initially, the police car was pulled over 7 to 15 feet behind Mr. Gonzales' van on Bond. And the police car was pulled over 7 to 15 feet behind Mr. Gonzales' van on Bond. And the police car was pulled over 7 to 15 feet behind Mr. Gonzales' van on Bond. What did Ellis do when Gonzales drove away with Wyeth in the van? Well, from our perspective and the facts, Mr. Gonzales rolled away. What did Ellis do? What did Ellis do? From a timing, the big issue is timing. And in a certain sense, that supports our view that this was a, that it was actually going very slowly. The other piece of physical evidence about Mr. Ellis, actually, which supports the idea that there's internal inconsistencies that ought to be resolved by a jury, is that Mr. Ellis, Officer Ellis, is within the car, right? Within the van? His upper body is within the van because he's putting a carotid hold on Mr. Gonzales. When you say car, it's confusing because it's a van. I'm sorry. I'll use van to distinguish it from Mr. Gonzales' vehicle. So he's got his arm around him trying to put a carotid hold on him. And according to Officer Wyeth's testimony, Mr. Gonzales immediately put the car into, in a very quick motion, put the car into drive and floored the accelerator. Now, Mr. Officer Ellis was not injured. Officer Ellis wasn't stuck in the car. Officer Ellis suffered a minor bruise to his knuckle out of the entire incident. And so in addition to the discrepancy in the testimony in terms of whether the car was going slowly or whether it was going at 50 miles an hour as the officer testified, there's other evidence that would suggest that the, that in fact the car was going slowly. Because otherwise, Mr. Officer. Well, does it matter? Mr. Hoffman, does it matter? We apply the three Graham factors. And the question is, Officer Wyeth is now trapped inside a moving vehicle and he's not in control of the car. And we have a person who has committed now a number of serious crimes, not the least of which now is false imprisonment and kidnapping. And the question under Graham is whether an officer in that situation with a noncompliant driver who is resisting arrest and attempting to flee could reasonably believe that his safety was imperiled such that that deadly force was reasonable. Isn't that the inquiry that the Supreme Court says we have to make in these cases? Well, I would challenge a few of the points that you made in terms of serious crimes. I mean, I think that the facts in this case don't show that. Well, 148 of the penal code was committed when the driver refused to turn off the car. It was false imprisonment and kidnapping when he drove away. And it was battery on a police officer when Gonzalez struck the officer a couple of times to try to keep his arm away. And it was also assault with force likely to produce great bodily injury under 245, all of which happened within a span of about 10 seconds. Well, if you credit the officer's testimony entirely. Well, you don't dispute that Gonzalez drove away with Wyeth in the car. And you don't dispute that he didn't turn off the car or open it up. Well, what we do dispute is the starting point for the analysis. But you do not dispute that he drove away with the officer in the car or that he wouldn't unlock the car when asked to. As far as I can read the undisputed facts in the documents. Well, what we do dispute is that, I mean, we're not sure whether he drove away in that sense. The car moved and it moved slowly. And from our standpoint, it moved to get away from excessive force. You didn't dispute that in the facts. You want me to read to you the undisputed facts where you wrote undisputed? There's no question that he was. It was undisputed that your client struck his hand a couple of times to keep it away from the ignition and the gear shift. That's undisputed according to what the record says. The question is, was there something? I'm sorry. Was there a – somewhere I read a reference, but I couldn't find it, to a declaration by a passerby or an eyewitness who said that the door actually never closed? Clark. Clark wasn't an observer. Yes. My understanding from that is that that declaration was never obtained and submitted to the court. Right. So that's not in there. But I think it's important to start at the beginning of the way this came – this situation happened. Because we also – we have a claim that even if he had moved away in the – as an intentional, volitional act, that he was justified in doing so because he was being subjected to excessive force by the officers and that each of those instances of excessive force had to be decided by the jury under the Graham analysis. You didn't contest the initial basis for the stop, did you? You conceded that the officers had reasonable suspicion that Mr. Gonzales was driving under the influence of something when they pulled him away. Well, I don't think – I don't know that we conceded it or we just didn't argue that, but – Well, the district court so ruled and you didn't appeal that determination unless I've missed something on the record. But as far – So we begin with a situation where officers have probable cause to make a misdemeanor arrest, and then Mr. Gonzales forcibly resists that arrest and refuses to comply with lawful commands to turn the ignition off and put his hands up while he's inside the car. And then the next thing we know, the fight is on because he's not complying with anything they're telling him. Well, they don't have probable cause that he did anything at that point. They might have had a reasonable suspicion for a carry stunt, but they have no information that he's committed any criminal activity. And the only thing they said – Well, the car was associated with a narcotic stop the year before. That doesn't mean that he was in it or he was the person. They have no information about that. Could the officers see in the back of the van or was it closed entirely except for the front windows the way a van usually is?        I don't know. I don't know. I don't know. I don't know. I don't know. No, I'm not sure. Are there any photos of the van in the record? I didn't see any photos of the van in the record. I didn't either. There is testimony in the record, though, that the situation was well lit, that when the officers came to the van, Officer Ellis on the left and Officer Wyatt on the right, they had a flashlight. They also had a spotlight. There was no question that there was enough lighting. There was never any weapon that was ever seen by either of the officers There wasn't a weapon found in the car, was there not? Well, there's some testimony. There's some deposition testimony from Officer Ellis about that. About finding a folding razor knife between the driver's seat and the driver's door, which is where Mr. Gonzalez repeatedly reached. In fact, he was warned by Officer Wyatt on approach that if he tried to reach into that area again, he was going to be shot. Well, actually, that's Isn't that so? What Officer Wyatt testified to was that when he approached the car, he saw Mr. Gonzalez reaching towards the back of the van, and he told him that if he reached the back of the van again, I'll shoot you. And Mr. Gonzalez complied with that. Wasn't there testimony from both officers during the altercation that he tried to reach into the area between the driver's seat and the driver's door? I don't think there's any doubt that there's testimony. If you believe what the officers said, obviously it's a completely different situation from what you might believe if you took into account that this is someone who Let's take the facts in the best light you can present them. Okay. I mean, the light Wait, wait, wait. That's not a question. That's a, let's start at the starting point. Okay. No, I mean, I have a specific question. I have a specific question. So what does an officer do in Officer Wise's position? He is in a van, in a vehicle that's moving. You know, we'll give you the speed, whatever you want it to be. It's moving. Nevertheless, it is moving. It could start moving more quickly, very fast, with a noncompliant suspect. What does he do in that situation to preserve his safety, to preserve the safety of those who might be out there in the path of the van? What was he supposed to do? Well, one of the things that he could have done was he could have taken out his gun as he did before, and he could have said, if you don't stop the car, I'm going to shoot you. He could have given a warning. He could have given a warning. And there's really nothing in the record that indicates that he couldn't have done that, particularly if the car is going very slowly for only a certain amount of feet. Why didn't he take out, why didn't he say to Mr. Gonzales, someone who had actually responded to that kind of threat before, why didn't he just take out his gun and instead of put it six inches from his head and blow his brains out, why didn't he say, I will blow your brains out if you don't stop this car? Or the other thing that he could have done was, because if you blow the driver's brains out, presumably if it's going 50 miles an hour, you're going to get hurt because you're not seat belted in, and as soon as that car stops or hits something, whether it's a person or anything, you're going to go through the windshield, which didn't happen. Why isn't this exactly what the Supreme Court told us that we're not supposed to do, and that is measure these things with the clarity of 2020 vision and hindsight, and we're supposed to make allowances for the fact that these things occur in tense, ever-evolving and rapid succession. But on the other side of that, though, Your Honor, is that the reason that there are standards about requiring that the harm be immediate, for example, rather than hypothetical in Graham, that the crime be severe, that all the factors are there, is to protect the public, too. The officers get lots of protection. I agree with that. And they have other doctrines that protect them, too. But Mr. Gonzalez had a life that was snuffed out, and that's the issue here, right? And so the question is going to be, what are the facts, for one thing? We don't know the facts. Let me just read you three undisputed facts. He yelled at Gonzalez to stop. However, he did not comply. Undisputed. 18D. Wyatt reached with his left hand and attempted to either turn off the ignition or shift the transmission to the neutral park. However, Gonzalez would hit his hand away. Undisputed. 18D. This occurred approximately two to three times. Undisputed. So he tried, according to the way I read the facts and the like most favorable to you, the officer tried many times to turn it off or slap the gearshift out of drive and his hand was slapped away by your client. Is that right? Your Honor, I should look at 18D if that's what it says there. See our page 232. It's your document. Line 6 through 13. D as in dog or B as in boy? All three. B, D, and D. It should be B, C, and D, but it's not. Or B, D, and D. And your response and objection was undisputed. I see that and I see after that there's also facts that he had not seen a weapon at that point. He seized the guy's hands. The only time I'm trying to get you to respond to, he yelled at him to stop and he tried to stop the car and was unsuccessful. Admit that. If we've said it's undisputed, then we have for the record. There certainly were other things he still could have done. He had a taser. Right. He could have shot somewhere other than right back in his head. Right. What the case law on that question, i.e., how much do we take into account alternatives, seems somewhat murky and I'd like some elucidation of that. Well, I think that what the court has said is that the officer is now required to use a less intrusive means as long as it's within the range of reasonable range. But I think the court has also said that within the Graham analysis and within the Tennessee v. Garner analysis, that the court can take into account, a jury can take into account, whether there were less intrusive means available, including all of the means that you've indicated, that he had other weapons that he had, some of which he used before, and that he had the ability to warn him and prevent this death, because it was under the facts as a jury could find them. This was not a car going at that length. The other thing is that the fact that there is that discrepancy a jury could find, that a lot of the rest of what the officers have said maybe should not be credited. For example, there's other information in the record that Mr. Gonzalez, first of all, did comply with an order. So why was it that he didn't comply with other orders? Well, the way you say that in a testimony is that he kept reaching down between the seat more than once, both before he took off with Officer Wyatt inside and afterwards. I understand that. No, don't do that. Show us your hands. And instead he clenched his fist, apparently with a plastic baggie in hand, and refused to obey your commands. I don't understand your recitation of the facts. Well, there are other facts from which juries can draw reasonable references. It is true that Officer Wyatt hit his hand with the flashlight, and that there was a movement to his home. Wyatt or else? Wyatt, initially. Ellis hit him in the back of the head afterwards. So from our perspective, one of the things a jury could find in this case, it seems to us, particularly given the fact that a jury could find that there really wasn't a lot of justification to stop the car. I understand what you said, but, I mean, they basically said that the car was weaving in its lane and that it wasn't a traffic violation, that they stopped it. And then when he came in, he complied with their initial command. And then he gets hit on the head. He had at least three vehicle code violations that he committed before they made the stop. So I don't understand your statement that he hadn't committed any violations. But that's still not, those are still not serious, I mean, within a Graham analysis, those are not serious offenses. No, it got more serious when he resisted the arrest and refused to comply with their orders, and then things went downhill in a hurry. If he did those things, but that's what the question is, would a jury find that? Well, you would dispute. Because the jury might find. You would dispute that he refused to turn off the ignition. No, I understand. You agree to that. I understand that there are commands that we have not disputed that he didn't respond to. And that's a classic 148 of the penal code. Okay. But the question is, in these circumstances, in these circumstances, does that mean that that's a severe enough crime to use deadly force? They didn't use deadly force. Right. They first tried hands, then they tried a flashlight, then he tried to disengage the car, and it was at that point that deadly force was used. I think that the analysis of the carotid hole is that a carotid hole is reasonably likely to cause death or serious bodily injury. It's the point of the carotid hole. I see that my time isn't every 20 minutes now, please. Well, it is. I don't disagree with you, by the way, on the carotid hole. But there's, you know, there's an expert testimony in the record by Lieutenant Clark that that's considered a high level of force. And that's what he did. And I think that if a jury could look at this and say that, you know, these officers, in response to him trying to swallow some undefined amount of drugs, whaled off on him, started to hit him, put him in a hole that could have caused a heart attack or other serious injury. Then Officer Wyatt is punching him in the head as hard as possible. And then Officer Ellis is hitting him in the back of the head with a flashlight. One of our theories, which was not we don't think was adequately dealt with by the panel, was that if a person subjected to that kind of a beating has the right to leave the scene. I thought the testimony was that they didn't start hitting him until he brought the closed fist close to his mouth and the officer suspected he was trying to ingest the contents of the plastic bag that he was clutching. Right. And the question is, can you use deadly force? Could you use deadly force to stop him? No. They didn't use deadly force at that point. A rotted hold is higher. That's not just the tap on the wrist. It's something that can kill you. And it's something that can cause a heart attack or blood clots or other serious things. So he's holding him like that. And then the other officer is punching him as hard as he can in the back of the head. And then Ellis is hitting him in the back of the head. What we're saying is that a jury looking at all those facts and taking reasonable inferences from them could decide in the plaintiff's favor. We're not saying that that's a likely result. We're not saying that a jury couldn't find the way that the courts below have outlined the evidence. We're not saying that. All we're saying in this is that if you take seriously the obligation to undertake a searching inquiry from both sides, it shouldn't be only from the officer's side. One should look at the facts and reasonable inferences from the plaintiff's side. And one should see if a rational jury could decide that. And the issue that Judge Clifton identified in the dissent below about the difference in speed is a huge difference. It creates a huge difference between whether a car is going 3 to 6 miles an hour at the time those decisions are made and a car that's where someone has floored the accelerator. Ginsburg. On the speed issue, the question isn't what the average speed is, right? It's the question of what the speed was or was perceived to be at the time of the shooting. So couldn't both things – there's no expert evidence at all about anything related to the speed of the car or how fast it could speed up or anything like that. Or even the actual distances, which is sort of odd because when you look at the map, the actual distances don't match up very well to the perceived distances. No. In fact, I mean, the other side certainly could have brought in evidence that there were longer distances. They have plenty of time, access to the scene, the whole thing. Instead, they've left the testimony as it is several times and never changed it. On the speed issue, in fact, 21d says that the car ended up at Elm Van. The van ended up at Elm and Bond Street. Well, where it ended up is less important from the testimony than where the shot was from. The shot was very important because if the car is going three to four miles an hour, three to six miles an hour, and it stops at 50 feet, and then the officer puts it into the truck, the Mitsubishi truck, which is across the street, on the west side of the  Then where was that truck? Was it in the block between Santa Ana and Willow? Or was it between the block between Willow and Elm? Because if it was going very slowly and you go into that Mitsubishi truck, that would be in the first block. And the van would never reach Elm Street. The van had to be going faster than three to six miles an hour. But there's, you know, obviously... From the physical evidence. But I think the point is that a jury should take into account all of those facts and decide that. And you've got... Excuse me? We have no idea on the record how long it took the car to stop. No, we don't. After the shooting. We don't. So it could have been another block. And, in fact, we have testimony... In fact, I'm mistaken. It probably was. We have testimony from Officer Wyatt that the accelerator was still... That Mr. Gonzalez still has foot on the accelerator after he was shot. So we don't know how far that went. Now, the one thing we do know is that he... Officer Wyatt wasn't injured as though the car was going 50 miles an hour. We don't have any evidence that the car was damaged in any way. There are no photos about where the car stopped. There are no photos of any skin marks or anything on the ground. There's just no physical evidence about any of this? There's not in the record that I'm aware of. And I think that that's one of the issues where it seems... Did you subpoena any of that information? I mean, as I understood it, there was a full investigation by the Orange County District Attorney's Office. I'm assuming the Anaheim Police Department must have conducted some sort of a review of the use of deadly force by their officer. Did you request any of that in discovery? Your Honor, I don't... I wasn't the trial lawyer. I don't... You don't know? I know what's in the record and what's not in the record. And it seems to me that... I understand your main point is that it's a jury question about what is and what is not reasonable force. Right. Not a disagreement about what actually happened. Is that right? Well, I think it's both. Well, tell us what fact exactly you disagree with. I think there's a disagreement about how fast the car was going. Let's say your fact was going about 3 miles an hour? That it was going very slowly. But, counsel, there isn't a disagreement, right? The district court took the facts in the light most favorable to the plaintiff. You allege that the van was going, had gone 50 feet, traveling less than 5 miles per hour, and that's what the district court assumed for purposes of its order, right? Well, the district court did assume that. The district court assumed that. It's not clear that the panel assumed that. Any other fact in dispute? Any other about what actually happened? Not whether it's reasonable or unreasonable. Any other fact of what occurred? I think that, I mean, maybe what I was trying to say inartfully was that if you take the other facts of this incident, in terms of the fact that he had, there was no evidence, at least from our standpoint, of serious, any kind of serious criminal activity from their testimony about when they saw it, his compliance with the whole, I think that you could look at the facts. I mean, we did what he did, whether you regarded it as serious or not, as a judgment  of the court. But, I mean, is there any dispute about what he did, what your guy did? I think that there are some disputes. Tell us again. Try to pin it down. Well, I mean, for example, on the carotid hole. I mean, there's some testimony that he was in some way struggling. But what does struggling mean? He's got somebody with his arm around his neck, and another guy is beating the crap out of him. I mean, what does struggling mean? Judge Silverman's, what I thought was his original question, which is still unclear to me, let's assume they were going on the slow end. Right. In the car. Right. Because there is a conflict in the testimony, potentially. Right. And the officer is in the car at this point, correct? Right. And he testifies, he tries to stop the car, gear shift, that doesn't work. So basically, we've got the suspect driving down the street with the officer in tow. And is it your position, if he had been going the fast speed, that it would have been reasonable what happened, or no? I think it would depend on how the jury looked at all the circumstances. I think that would be a much tougher case from our standpoint. But our point is that it wasn't that. That a reasonable jury could find that it was going much more slowly and had time to We're saying, I gave you that. Okay. The carotid hold is over. Right. The flashlight is over. Basically, you've got an officer held captive in a car going down the street at possibly three to five miles an hour, giving you the most favorable rendition of the facts. And I'm trying to understand if your position is, at that point, that the officer's not in danger? I mean, is he supposed to wait until, let's say he's going three to five, he's supposed to say, well, I guess I shouldn't do anything. I should wait and see if he guns it. What is the officer supposed to do at that point? What's reasonable? Well, I think the answer to that question, I think, is that in all these circumstances, we think a reasonable jury could find that it was unreasonable not to give him a warning or use alternative methods before he took actions that were clearly designed to kill him. Right? Well, I think the answer to that question is that basically he could have given a warning or could have used a taser. Right. Right. He could have done something other than shoot him through the head. You don't have one rendition of the facts and they have a different rendition of the facts. You're saying that under the facts, it was just unreasonable to shoot him. Is that right? Well, I think we do take the position that... Well, I keep asking you. Tell me the fact that you dispute. Well, the facts that we think a jury could draw different inferences from is, is it reasonable, for example... That's what I just said. The facts, the facts, the facts. No, I understand. For example, the struggle. If the struggle is them hitting him, then that's different from him doing anything. Because there's no evidence in the record that he was combative. He didn't hit them. He didn't have a weapon. There is a disagreement in the record. It's just that we've given you your facts. Right. Because the defendants do insist that he floored the car and that it was accelerating and that it was going 50 miles an hour. Right. So to that degree, there is a dispute in the record. Well, there's a dispute about dispute. What I'm suggesting is that a jury could draw different inferences from the other facts leading up to that situation. And that that's important from the standpoint of evaluation. But there are two questions. One is if we give you your facts, is there anything other than unreasonable to say, Mr. McCoy? And the second is, is there actually a dispute of the facts? There is a dispute of the facts. But if we give you your facts, then you're just looking at the reasonableness. Right. No, that's right. That's right. I'm sorry. Maybe I misunderstood. You're out of time. Yes. Thank you. We'll hear from the defendants. Good afternoon, Your Honors. Moses Johnson, Assistant City Attorney on behalf of the City of Anaheim and Officers Wyatt and Oz. There's really only one fact disputed here. How fast was the van going with Officer Wyatt trapped inside? The only fact that the plaintiffs really put forth to the Court, based upon Officers Wyatt's estimates a year and a half later, how fast and how far. Officer Wyatt testified in his deposition that the van was going approximately 40 to 50 miles an hour and it traveled approximately 50 feet. I mean, that's blatantly impossible because you can't start a car at 40 miles an hour, right? Your Honor, a car accelerates very fast. If it started going for 10 seconds, it couldn't have been going 40 miles an hour. It's impossible. I disagree, Your Honor. This is not in the record, but this minivan. Well, if it's not in the record, we can't consider it, counsel. I understand, but the Court can take judicial notice and no, we can't. And what it showed was that it will get up to 50 miles an hour after 11 seconds. So it's impossible that it was going 50 miles an hour for that whole time period. It's just impossible. He testified it was going 40 to 50. It could very easily have been going close to 40. Is there anything in the record that shows us with a diagram that's reliable the distances that are involved between where the car or the van was, where it bounced off the truck, and where it ended? I'm having trouble finding anything reliable in the record that's objective. There's no diagram in the record. Why not? The only thing that I put in was the officer's deposition testimony and their declarations. Counsel, what disturbs me about this case is it comes to us in an unusual posture in a way, because a lot of these cases are qualified immunity cases, but this one is not. It's just a straight-up summary judgment case. So my question, I think, is the same as Judge Silverman's to opposing counsel, which is, assuming the facts as the district court did in the light most favorable to the plaintiff, why isn't there a jury question about whether the use of deadly force was reasonable in all the circumstances? Cars can accelerate very fast. If this car was going only 5 miles an hour, which the district court found in its order. No, it didn't find it. It assumed it because at summary judgment we have to take the facts in the light most favorable to the nonmoving party. Assuming it's going 5 miles an hour, it's already got a running start, it could accelerate very fast past 30 to 50. So your position is that it is reasonable as a matter of law to kill a person by shooting him in the head at point-blank range when a car is going 5 miles an hour because it could speed up? You have to look at the totality. That's a yes or no question. Is that your position? Yes, based on the totality of the circumstances in this case. It's everything that led up to that. What happened prior to that? Why it got trapped in that car? It was a suspect who did not at least show a weapon, who was not known to have committed any crime when all of it started and at most seems to have had a small amount of narcotics, and who hadn't threatened anybody because he hadn't said anything. So what are the circumstances? Your Honor, he kept reaching between the driver's seat and the door. Both officers testified that they feared he was reaching for a weapon. There was a threat. Is that an undisputed fact? Yes. There's a lot of facts that plaintiffs did not dispute in this case. And I set forth those facts very clearly in both of my briefs. But the problem, of course, is that you can't dispute a fact when you have a dead plaintiff very well. You can look for contradictions. And if there are contradictions, and we do this all the time in immigration cases, you can say, well, maybe we just don't believe these people at all. And that's really the question here, isn't it, for the jury. If this guy says he's going 40 miles an hour and they say he could have been going 40 miles an hour for the period of time he said he was going 40 miles an hour, so I don't believe this guy, i.e., Wyatt. And why isn't that a possibility? I don't believe other things. I don't believe the guy was reaching for the last because I just don't believe this officer. Your Honor, anything is possible. They have to show a material fact. They could have put in an expert engineer's declaration saying, based upon the officer's testimony, it was impossible for this car to go 40 miles an hour. But it's your burden if it's your motion for summary judgment. That's right. To demonstrate that there is no material issue of fact, as well as that you're entitled to judgment as a matter of law. And Judge Berzon is questioning you about the fact piece, and I'm still muddling over the law piece, but. And my fact piece that I put in was my officer's testimony, and I feel that is sufficient unless the plaintiff can show my officer is flat-out wrong, which they didn't  do. But they don't need to do that on summary judgment. In other words, they don't even need an expert at trial. They could roll the dice and say, common sense, we're going to rely on the jury. We've got these two opposing facts. So why couldn't a jury say, you know what? I'm going with my common sense, my gut on this. You might want to put in an expert. They might want to put in an expert.  Right, Your Honor. And my common sense is, in the practical little test I did, I drive a Prius. I could drive across a 50-foot intersection and get up to 35 miles an hour in less than 5 seconds. So my common sense tells me there is no way this car was going 3.4. But that actually kind of underscores why it might be a factual issue, because we really don't know. And people are going to have to use their common sense. They're going to have to use the other parts of the record to make this determination. And so the real question is, you may be totally right, and my instinct goes with your common sense, okay? Okay. But that doesn't quite answer the question of why then, why not let this go to the jury, because that's exactly the kind of question a jury would answer, not a judge on summary judgment. But the only fact that they put up, and it wasn't a real fact, they asked the court to take judicial notice of distance and time and what the average speed was. They didn't put any evidence in that cars travel at average speeds. Cars accelerate faster. Wait, wait, wait. That evidence came from your client's testimony. Your client gave the estimate of time. Your client gave the estimate of distance. True. Your client gave the estimate of speed. True. That wasn't made up. True. So, again, those three pieces don't fit. If they don't fit, why can't the jury decide, well, if he's not telling the truth about all those three pieces, he's not telling the truth about other things. Your Honor, anything's possible, and I doubt the court would disagree. Not respectfully disagree. I don't see possible as in hypothetically. Why couldn't a jury conclude your client wasn't telling the truth about at least one of those three pieces? Again, Your Honor, anything's possible. A jury could disbelieve him. I think it's highly unlikely. If the jury does disbelieve him, how is this a summary judgment case? It's a summary judgment case first. They have to raise the jurors' dispute. You have to establish that a reasonable juror couldn't reach the conclusion that your client's testimony wasn't credible. Because they haven't put forth anything to show that. An average speed doesn't dispute what my officer testified to, because cars don't travel at average speed. I challenge you to try to incorporate this fact. Okay. What evidence is there that this car was traveling at 40 to 50 miles an hour within five seconds as your client testified, other than your client's testimony? There is none, is there? The only other is if you go through his deposition testimony clearly, and I can point it out to you. Where did the car end up? One key fact that's in the record, ER 148, when he took control of the car after shooting him and steered it into that little Mitsubishi truck. You know what happened to that truck? It went up on the curve. If it was going three miles an hour, that never would have happened. Okay. So where's the rest of the case? It seems to me you must have had a reconstruction team out there measuring distances, taking pictures. We know that the law of physics can be applied in order to tell us conclusively from evidence of skid marks or points of impact what the speed of the vehicle can be estimated. Are you telling us that that was never done here by the Anaheim investigators? No, no, no. And why didn't you present that to the district court so that we wouldn't be sitting here speculating and trying to wrestle with this impossible resolution of Officer Wyatt's estimates? Let me say this. One, if you look at the deposition testimony of Officer Wyatt, plaintiff put a bunch of photographs in front of him. But when they put the deposition testimony in with their opposition, for some reason they didn't attach those exhibits. Well, you could have. At the time that I moved for summary judgment, the transcript hadn't been received yet. I mean, where is photograph number four that shows the truck up on the curve with the left rear tire resting against the curve? Where is that? That's not in the record either. Am I right? The plaintiff did not attach any of the exhibits. Did you put it in? It's your motion for summary judgment. I understand. But, again, at the time I moved, the transcript wasn't done yet. There's an elephant in the room. Usually these cases come to us as qualified immunity cases. This is not. Why? The reason is whether the trial will issue a fact is the same in both qualified immunity and Fourth Amendment cases. It's the same question. And it's the same test. Did you get the toxicology report from the medical examiner's office on whether or not this guy was under the influence of anything? And why didn't you put that in the record? It's an after-the-fact issue, Your Honor. The test in this case is what the officer perceived and knew at the time he pulled the trigger. With respect to that. What's that corroborate, what he might have perceived with the guy and his conduct in reaching for a bag and trying to swallow it? I mean, in other words, you put the case together not on the thinnest possible, but based on all the facts. And you keep saying, well, everything, the transcript was later, the test was later. Was there ever? But you chose to move to summary judgment at that time, correct? Because that was my cutoff. The deposition was taken right before the cutoff. And it was unfortunate timing. But that's the judge to say, well, look, we actually need this additional evidence, so we need a short time beyond the cutoff. I did not ask for additional time. I moved when I could. I have a question. You moved for summary judgment and you didn't put any evidence in because the transcript didn't exist? I put in the rough transcript of Officer Wyatt's testimony along with his declaration. And you could yourself have got off and gotten some photographs to corroborate any of this? I probably could have attached the photos. I didn't think it was necessary. Well, that's a different answer than that you were under the gun. You just didn't do it. I did not do it. Let's assume we feel his testimony is sufficient. Let's assume that the facts are the facts. There's no dispute about what happened. Is it still a jury question about whether what the officer did was reasonable? No, there's no jury question here. They haven't raised a disputed issue of material fact. The only thing they're trying to dispute is speed. Counsel, Judge Gould on the video. Can I interject one question? Sure. Is there any, whether the officer had a subjective belief that his life was in danger at the time that he shot the guy in the head? He testified he was in fear of... He said he did, right? Yes. He said he did, but could a jury from the other evidence have rejected that testimony? Anything's possible, Your Honor. The jury could disbelieve him, but I don't think they would based on the totality of the circumstances. He testified he was in fear of two things. One, that the van was going fast and that the decedent would crash the car. And this was a T-intersection. Well, let's back up a minute here. I mean, the whole beginning of this case is kind of weird. I mean, a guy cuts them off, and they don't go do anything about it. And then they go off and do something else. And then they come back and the guy happens to still be there. He could have certainly not been there. So they obviously weren't all that concerned about him, because if they were, they would have gone after him the first time. And at some point, they run a test and a check and discover that this car a year ago was involved in some crime. And then they go to the guy with a gun and tell him to get out of the car. They immediately, the two of them go up to him and pull a gun on him. That's the first thing they do? Your Honor, they didn't pull a gun until they saw him reaching. Well, counsel, I had a question about that, because it's my recollection that Ellis did not say that he saw any movement at that time. Wyatt did, but Ellis didn't. They were in different points because they were coming up different sides of the car. No. Wyatt testified that he saw them when the car hadn't pulled over yet. But Ellis didn't. True. But Wyatt saw them as reaching as they were rounding the curve from Santa Ana onto Bond Street. He saw them reaching back. So isn't that a contradiction between the officers that creates an issue of fact as to whether Wyatt is correct or Ellis is correct? That's not a material fact. That's one of the early facts in the case. Well, but it's material as to whether one thinks that Wyatt is trigger-happy, essentially. I mean, why were they behaving this way? Well, why was he behaving this way? As to someone, as to him, at that point, they had, what did they know about him? Why did they even start worrying about him? It was just completely coincidental. Your Honor, he almost ran into them making a left turn. Right. And they left. And then they left. So they obviously weren't that concerned about him. But they came back and they watched him, and then they saw him weaving. He could easily have been gone by that point. He just wasn't there. So what? That's possible. They decided to go to their other call first, and they quickly came back. And then they followed him. They saw them weaving in the lane. They lit him up. He kept driving 200 feet. And then he makes this wide turn onto Bond Street. He almost hits the curb on the other side before he finally pulls over about 25 feet from the intersection. Officer Wyatt didn't fire until the very end when he felt his life was in danger because he's trapped inside this van and he doesn't know what this suspect is going to do. It's also undisputed that Officer Wyatt didn't give any warning, right? If we assume that Officer Wyatt testified truthfully, the gun had been holstered. The car took off at some rate of speed. He said stop. Gonzalez didn't stop. And they took his gun out and shot him without any warning. But first, Your Honor, he ordered him to stop. He didn't do it. He reached over three times to try to turn the car off or shift it out of gear. He got his hand slapped away three times. The car didn't accelerate. What's he supposed to do at that point? Counsel, my question for you, and I do get to ask the questions, please, and would like you to answer. Am I correct that it's undisputed that he didn't give any warning that he was going to use lethal force? He didn't say stop or I'll shoot. I concede that. Did he say anything other than the one time he said stop? And at the time he said that, the gun was still holstered, right? I believe so. Haven't we said that an officer must give a warning before using force if it could result in serious bodily injury as long as that warning is practicable? It is only required if it's feasible. In this officer's mind, it wasn't feasible in a speedy manner. Counsel, my question is, where did the district court consider that? Can you tell me anywhere in the order where the district court considered as a ground factor whether a warning was given, whether it was practical to give a warning? I believe the district court said something about the fan accelerating, and that's when he concluded what the officer did was reasonable. What about the expert testimony on that point? Because does that raise a factual issue on the point that Judge Christin is raising? No. He talks about reasonable police practice, and he talks about the failure to warn. Why doesn't that raise a reasonableness question? This Court has held many times the fact that plaintiff puts in an expert declaration that dispute what the officer says does not raise a trialable issue of fact. This Court has to determine what the officer did was reasonable. Well, let me go back. I didn't actually read the declaration as disputing the officer. I mean, the officer, there's no dispute he didn't give a warning. Correct. But in terms of what reasonable police practice might be, that would be admissible, wouldn't it? You might not believe him. You might think, well, he's biased or he's just hired by the plaintiff. But wouldn't that be admissible, and then you'd have the jury weighing that evidence? It's only a guideline, and it's not law. And the Anaheim policy actually follows this circuit's holding that you only have to give a warning when it's feasible. It's not mandated when an officer ---- No, I understand that. But my question, maybe I'm not being clear, but you're taking the position that it's not mandated, this is Anaheim policy, et cetera. If you have someone who says this is a reasonable police practice, and the ultimate question is whether there was the ---- whether the use of the deadly force was reasonable, why doesn't that alone raise a factual question that means that it should go to the jury? Because this circuit has held over and over again the fact that plaintiff puts in an expert declaration from a police expert that says that what the officer did was unreasonable doesn't raise a tribal issue of fact. Otherwise, we could never get out on summary judgment, and this circuit's never held that. Counsel, I think we unintentionally talked at the same time, talked over each other. So I couldn't hear the answer to my question, but I think you tried to answer it. Did the district court consider whether or not it was practicable to give a warning? Does his order address that? I believe he did when he talked about the van accelerator, Your Honor, and that's what I said before. When the van ---- I don't understand your answer then. You believe he did when he talked about the van accelerating? Yes, that's what I said. How does that respond to my question? It might be helpful for you to consult the order and tell us where it's asked to address Kristen's question. If you look on page 9, the very last paragraph, the very first sentence says once the decedent successfully slapped the van into gear and started moving forward, it was also reasonable for Officer Wyatt to perceive a substantial risk that the decedent would seriously injure or kill him by suddenly accelerating the van or crashing it into another car or object. That's what I was referring to, Your Honor. I'm sorry. On page 9? ER9. It's page 7 of 10 of the order. Thank you. I'm sorry. Page 7, and you're in the last paragraph? Last paragraph, first sentence. That's what I was referring to. That first sentence? Yes. That's as close as he comes? Well, at the bottom he says, Thus, even considering the facts and the like most favorable to plaintiffs, the Court finds that Officer Wyatt acted reasonably under the circumstances when he shot the decedent. Okay. So my question is, is there any indication here ---- I believe that our case law requires the district court to consider as a grand factor the failure to warn if a warning is practicable. And I don't see that the district court gave consideration, made a finding about whether it was practical to give a warning here. My understanding is that your answer is that's as close as the district court came. Is that right? I would have to go back and look at how he recited the facts. I thought he covered it, Your Honor. Thank you for your candor. Anyways, again, I felt what I put forth in my summary judgment and my officer's testimony, it was sufficient to shift the burden to plaintiff. The only fact that plaintiff put forth was an average speed. I don't think that's sufficient to raise a triable issue of fact. The Supreme Court said in Scott v. Harris that mere existence of some alleged factual dispute will not defeat a motion for summary judgment. It must be material. The Supreme Court also said that the court must still work its way through the facts to determine whether the officer's actions were reasonable. And most of the facts in this case, if you look at them very clearly as to what    They are not disputed. And there are many that are disputed. Isn't it possible that the facts are not disputed, but you're still not entitled to judgment as a matter of law? It's still a jury question. If this Court feels based upon the undisputed facts, which would then raise a question of law for this Court as to whether my officer's actions were reasonable, and you thought there was some question of that, I guess that's possible. Well, it would certainly help us in making that analysis if you had given us more facts that are apparently in your possession, such as a diagram of the scene with distances measured off and the toxicology reports and confirmation of what was in the baggie. Do you know whether or not the contents of the baggie were ever analyzed? It was structured on that. Well, why didn't you put that evidence? Because, again, in a shooting case, it's my understanding the test is what did the officer know and reasonably believe at the time he pulled the trigger? If you look at our decision in Scott v. Heinrich, the panel found it significant that the decedent had a blood alcohol of 0.312 at the time that he was firing rounds from his rifle on the second story of the building. Now, the officers had no way of knowing what his blood alcohol level was at the time, but it was relevant to the court's analysis that the fact that he was heavily intoxicated when he was firing. It becomes evidentiary corroboration. Yes. I'm not saying it's not relevant. It's certainly relevant to these questions that we're asking about their credibility. I mean, if they claim they saw something and what they believe they saw turns out to be true versus what they believe they saw turns out to be false, that's a relevant fact, isn't it? Sure. We don't have that. That's true. But I can tell you the officers reasonably that when he put his hand up to his mouth holding that baggie containing what they believe is drugs, what Officer Ellis did is he reached in to stop him from swallowing drugs and harming himself. And Officer Ellis said he never put him in a carotid. He was just trying to stop him from swallowing drugs. That's a real fact because Wyatt specifically said several times he did. That was Wyatt's perception from the opposite side of the car. But that's not a material fact relevant to the shooting. Well, why didn't you establish or confirm Officer Ellis' deposition testimony? I'm looking at ER pages 185 and 186. The question is asked, what weapons did you learn after the fact were found in the van? Answer, I heard there was a folding razor knife. Question, do you know where that was found or are you not sure? Answer, I heard that it was near between the driver's seat and the driver's door. Question, did you ever actually see it there? Answer, I did not. Why didn't you put in a declaration from the detective who processed the scene to say I recovered a folding razor knife that was found in the area between the driver's seat and the driver's door? Again, I was relying on the test mainly being what the officer knew or reasonably believed at the time. But doesn't that corroborate the reasonableness of the officer's fear that the suspect was reaching for a weapon when, lo and behold, there was a weapon there? Sure. Sure. But more than that, it corroborates whether or not the officer actually believed that. I mean, that's the problem we're having here. In other words, we only have one side of the case here. And a jury could say, well, they said that they saw him reaching there, but I don't believe them. Well, one of them said he did. Not both. Well, one thing I can say, and I cited to this in my brief under this Court's judgment, on any ground that has support in the record, you have a copy of both Officer Wyatt's deposition and Officer Ellis's deposition in the excerpts of record. You can read them both, and you can find what they said. I believe I've summarized them fairly accurately in my brief. And insofar as they don't conflict, we can't assume we have to say there's a material fact if we think it's material. I understand. We can't choose which one to believe. I understand there is an issue there. Did you say earlier you ran out of time, and that's why you didn't put a lot of this stuff together? What I said was, at the time of the motion for summary judgment, cut off the transcripts from the officer's depositions because they had just been taken, had not been received. That was your motion for summary judgment, is that right? Yes. So did you make the motion too early, or were you making it when you had to? I made it on the very last day, if I remember right. Did you ask for any extensions in order to augment the record with other material? No. But you said you actually did have the rough draft. You just didn't put things in because, I don't know why, because you thought maybe the pledges were. I put in, Officer, why it's rough, but I didn't have a final that had been signed and things like that. But it's not like you were completely at a loss. I mean, you knew what was going to be available. I had an idea. I mean, I was there at the deposition. But I felt I put forth enough facts to get out. And I think their testimony hasn't been really disputed. Again, the only fact that plaintiff has tried to put forth is that the car, if you look solely at an average based on distance and time, was going slowly. And I think that defies common sense. So I don't think they've disputed. You've got to remember, Officer White's deposition was taken a year and a half after this event. When officers are involved in an officer-involved shooting, they get tunnel vision. Their perceptions of time and distance get distorted. He gave the best estimate he could. But it was so easy. I mean, you could go ñ if he had gone to the location, he could have at least seen that, I gather, that the distances that he said, for example, between East Santa Ana Street and East Willow Street is not the distance. He gave an estimate that they were about 60 feet each, and there are actually a lot more than that. It wasn't very difficult to find that out. But we don't have a record about that. We just know what he thought. We have his estimates, and we also have his testimony as to where things actually took place. But you had more evidence that you could have given the court, which would have corroborated the reasonableness of the officer's actions and aided the court in its role of trying to carefully comb through the record when the only version of the events that we have are the testimony of the surviving officers. I understand when it's a deadly force case and when there's no eyewitnesses, this court needs to look at these cases carefully. I understand that. And I also understand that you would have felt better if I put more in, and I understand that, too. But I felt I put in enough, and that, again, plaintiff hasn't disputed much of the facts here. They don't dispute a lot of what the decedent did in resisting arrest and not stopping and not showing his hands and the struggle with the officers and the fact that there's nobody else alive who can speak to those subjects. Is that the ultimate message from this? If you kill the witness, you take the officer's testimony and he's undisputed? No, Your Honor. They could have put in an expert declaration from an engineer saying that my officer is totally wrong. Well, that's not what you're talking about now. You're talking about whether he reached for something. And there's nobody else who can speak to that. That's true. Is there? And so are we supposed to infer from that? Are we supposed to infer from the fact that they didn't try to fabricate a witness that that's exactly how it happened? Or isn't the jury allowed to consider whether your officers are credible? The jury is allowed to consider credibility. But, again, I think you need to look at what did plaintiff dispute. They did not dispute that Officer Wyatt ordered him to stop. They did not dispute that he reached over and tried to stop the car by turning it off. They did not dispute that the decedent slapped his hands three times away. Exactly. How would they have disputed any of those things? Isn't that the same problem I just raised? All of that is based upon your officer's testimony. There's nobody else around to see. They could have put in an expert declaration to try to dispute those. Exactly. How do you put in an expert declaration about whether somebody's hand was slapped away? That might be a little problematic. But does psychic work? Is that the expert testimony you have in mind? No. No. Okay. Thank you. Thank you. You're out of time. Mr. Hoffman, you're out of time. Would you like to take a minute for rebuttal? I can just say a couple of things. One thing, just on our position about the internal inconsistencies. I mean, for example, one of the other facts is that after the initial encounter between Officer Wyatt and Mr. Gonzalez, Officer Wyatt holstered his gun. Officer Ellis never took out his gun. I think a jury can look at those facts to consider whether, in fact, it's credible that the officers kept seeing furtive movements or other kinds of movements for weapons or really believed they were in danger as opposed to they were taking the actions of the carotid hold and other acts of what we consider to be excessive force in response to Mr. Gonzalez apparently swallowing some unknown quantity of drugs. And I think that those are two very different kinds of things. A jury could find that it's excessive to use a carotid hold or batter somebody on the back of the head with a flashlight to prevent them or to respond to swallowing a small amount of undefined drugs. But as a general proposition to end, really, is that I think what I hope is clear from this is that the summary judgment record is just not sufficient to carry their burden of taking this issue away from a jury in the circumstances where our client can't speak for himself and where this Court's jurisprudence asks that judges engage in a much more searching inquiry than was done at the district court level, taking into account the kinds of reasonable inferences that juries could take from all these facts in the favor of our client. Thank you. Thank you. Cases, how you'll stand, submitted. We're adjourned.
judges: Kozinski, Trott, Silverman, Graber, McKeown, Gould, Berzon, Tallman, Clifton, Bea, Christen